E. MARTIN ESTRADA
United States Attorney
DAVID T. RYAN
Assistant United States Attorney
Chief, National Security Division
KEDAR S. BHATIA (Cal. Bar No. Pending)
Assistant United States Attorney
Terrorism and Export Crimes Section
     1500 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-4442
     E-mail:   kedar.bhatia@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. 2:24-mj-7256-DUTY |
|---|---|
| v. | GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT OF ITS APPLICATION FOR REVOCATION OF RELEASE ORDER AS TO DEFENDANT YINPIAO ZHOU |
| YINPIAO ZHOU, | |
| Defendant. | |

The government hereby files this memorandum of law in support of its application for revocation of release order as to defendant Yinpiao ZHOU pursuant to 18 U.S.C. § 3145. After being charged by Complaint in this district, ZHOU was arrested on December 9, 2024, in San Francisco, California, and had his initial appearance the next day in the United States District Court for the Northern District of California. On December 10, 2024, the Hon. Sallie Kim, United States Magistrate Judge, ordered defendant released pending trial subject to certain bail conditions. *See* Case No. 3:24-mj-71740 (N.D. Cal.), Dkt. 2.

The government relies on the attached memorandum of points and authorities, accompanying exhibits, the files and records in this case, and such further evidence and argument as the Court may permit.

DATED: December 12, 2024        E. MARTIN ESTRADA
                                United States Attorney

                                DAVID T. RYAN
                                Assistant United States Attorney
                                Chief, National Security Division

                                _____/s/_____
                                KEDAR S. BHATIA
                                Assistant United States Attorney
                                Terrorism and Export Crimes Section

                                Attorneys for Plaintiff
                                UNITED STATES OF AMERICA

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................i

I.    INTRODUCTION..................................................1

II.   STATEMENT OF FACTS...........................................2

III.  Procedural History...........................................6

IV.   ARGUMENT.....................................................8

      A.    Legal Standard.........................................8

      B.    Defendant Should Be Detained Pending Trial.............9

            1.    If Released, ZHOU Poses A Substantial Risk Of
                  Flight And No Conditions Or Combination Of
                  Conditions Adequately Mitigate The Risk Of Flight...10

            2.    If Released, ZHOU Poses A Risk Of Danger To The
                  Community And No Conditions Or Combination Of
                  Conditions Adequately Mitigate The Risk Of Danger...14

V.    CONCLUSION...................................................15

# TABLE OF AUTHORITIES

*United States v. Castaneda*,
No. 18-cr-47-BLF-1, 2018 WL 888744
(N.D. Cal. Feb. 14, 2018)........................................ 12

*United States v. Dagesian*,
No. 2:21-cr-00057-MCS, 2023 WL 2061934
(C.D. Cal. Feb. 15, 2023) ........................................ 12

*United States v. Diaz-Hernandez*,
   943 F.3d 1196 (9th Cir. 2019) ................................. 8

*United States v. Evans*,
   62 F.3d 1233 (9th Cir. 1995) ................................. 9

*United States v. Gebro*,
   948 F.2d 1118 (9th Cir. 1991) ................................. 9

*United States v. Hir*,
   517 F.3d 1081 (9th Cir. 2008) ....................... 10, 12, 13

*United States v. Koenig*,
   912 F.2d 1190 (9th Cir. 1990) ................................. 9

*United States v. Motamedi*,
   767 F.2d 1403 (9th Cir. 1985) ................................. 9

*United States v. Tortora*,
   922 F.2d 880 (1st Cir. 1990) ................................ 13

*United States v. Townsend*,
   897 F.2d 989 (9th Cir. 1990) ................................ 11

*United States v. Winsor*,
   785 F.2d 755 (9th Cir. 1986) ................................. 8


Statutes and Rules

18 U.S.C. § 3142 ............................................. 8, 9
18 U.S.C. § 3145 ............................................. 1, 9
18 U.S.C. § 1503............................................... 7
18 U.S.C. § 1510............................................... 7
18 U.S.C. § 1512............................................... 7
Fed. R. Crim. P. 5(c)(3) ..................................... 6

i

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

Defendant Yanpiao ZHOU should be detained pending trial because there are no conditions or combinations of conditions that could adequately mitigate the risk of flight and could reasonably assure the safety of the community.

On November 30, 2024, ZHOU, age 39, traveled to a park near Vandenberg Space Force Base ("VSFB") and used a hacked drone to fly over and photograph sensitive areas of the Air Force facility for approximately 59 minutes. Notably, on that same day, November 30, 2024, a sensitive payload developed for the National Reconnaissance Office had been launched to orbit by a space contractor.

After military personnel detected the drone inside VSFB's restricted airspace, investigators traveled to the park and contacted ZHOU and another individual ("Individual-1"). ZHOU initially denied seeing any drone pilots but later revealed that he had the drone inside his jacket. The drone inside ZHOU's jacket was the same drone that flew over VSFB for an hour.

After being advised of his *Miranda* rights and agreeing to speak with agents, ZHOU admitted he flew his drone from the park to take photographs of VSFB. ZHOU further admitted that he downloaded specific software onto the drone to bypass the drone's built-in restrictions to prevent it from taking off and flying in no-fly zones. ZHOU said he knew taking photographs of the space contractor facility at VSFB was "probably not a good idea."

A search of the drone pursuant to a federal search warrant revealed several photographs of VSFB taken from an aerial viewpoint on November 30, 2024. A search of ZHOU's cellphone pursuant to the

1

same federal search warrant showed that ZHOU did a Google search approximately a month earlier for the phrase "Vandenberg Space Force Base Drone Rules" and messaged with another person about hacking his drone to allow it fly higher than it could otherwise.

ZHOU is a citizen of the People's Republic of China and most recently traveled to the United States on February 12, 2024. He was scheduled to return to China on December 9, 2024, via San Francisco International Airport and was arrested on that date at the airport.

No conditions can adequately mitigate ZHOU's risk of pretrial flight or the danger to the community. Importantly, the government is aware of no current ties between ZHOU and the United States, and certainly none sufficient to keep ZHOU in the United States when he primarily lives in China. The United States and China do not have an extradition treaty. There are no conditions or combination of conditions that could adequately mitigate the risk of flight because the only thing he is facing in the United State is a felony conviction, given the strength of the evidence, and a term of imprisonment. Under the preponderance standard for the risk of flight, the Bail Reform Act calls for detention in this case.

While the risk of flight is more pronounced in this case, ZHOU also poses a risk of danger to the community, given his serious offense and the planning and sophistication that went into it.

Accordingly, the Bail Reform Act calls for ZHOU to be detained pending trial.

## II. STATEMENT OF FACTS

On the morning of November 30, 2024, drone detection systems at Vandenberg Space Force Base detected an unmanned aerial system ("UAS" or "drone") flying over the base. *See* Complaint (Dkt. 1) ¶ 19(a). One

of the drone detection system identified the UAS as a DJI model Mavic 2 UAS, bearing a particular drone identification number (the "DJI Drone"). *Id.* ¶ 19(b). Another drone detection system indicated that the DJI Drone appeared to originate from Ocean Park, a publicly accessible park adjacent to VSFB. *Id.* The drone then traveled south toward a space launch complex that had been used, earlier that day, to launch a payload for the National Reconnaissance Office. *Id.* ¶¶ 19(b)-(d). The drone then returned to the vicinity of Ocean Park. *Id.* The drone flew for a total of approximately 59 minutes and traveled to a height of approximately one mile above ground level. *Id.* ¶ 19(c).

After detecting the DJI Drone, VSFB Security Forces traveled to Ocean Park to investigate the drone travel. *Id.* ¶ 20(a). There, Security Forces personnel saw two individuals, ZHOU and Individual-1, and asked to speak to them. *Id.* When Security Forces personnel started talking, ZHOU and Individual-1 walked away. *Id.* Security Forces personnel again asked to talk to ZHOU and Individual-1, who stopped and began speaking to them. *Id.* The personnel then asked if ZHOU and Individual-1 had seen any drones flying nearby and, if so, whether they had seen the pilot. *Id.* ZHOU stated that he had seen a drone but falsely stated that he did not see the pilot. *Id.*

While ZHOU and Individual-1 were speaking to Security Forces personnel, ZHOU had his hands inside his jacket. *Id.* ¶ 20(b). Security Forces personnel asked ZHOU to remove his hands from his pocket. *Id.* After they did that, ZHOU removed his hands, exposing a drone underneath his jacket. *Id.*

Security Forces personnel asked ZHOU why he had lied about not seeing the drone pilot, and ZHOU responded that he was afraid because

3

1  he believed that the Security Forces personnel were from the
2  military. *Id.* ¶ 20(d).

3      ZHOU showed Security Forces personnel footage that ZHOU had
4  taken using his drone. *Id.* ¶ 20(e). ZHOU showed the Security Forces
5  personnel the footage on a cellphone device attached to the drone
6  controller (the "ZHOU Cellphone"). *Id.* Upon seeing that the footage
7  consisted of parts of VSFB, Security Forces personnel instructed ZHOU
8  to delete footage of the base from the cellphone and watched ZHOU
9  delete the footage. *Id.*

10      Later that day, FBI agents arrived at Ocean Park and interviewed
11  ZHOU. *Id.* ¶ 21. After being advised of his *Miranda* rights and
12  agreeing to speak to the agents, ZHOU said, among other things, that
13  on November 28, 2024, he and Individual-1 stayed overnight at Kirk
14  Creek campground in the Big Sur area of Monterey County, California.
15  *Id.* ¶ 21(a). ZHOU stated that he tried to fly his drone at their
16  campsite at Kirk Creek, but a park ranger told him not to fly it. *Id.*
17  On November 29, 2024, ZHOU and Individual-1 drove from Kirk Creek to
18  Ocean Park. *Id.* ¶ 20(b).

19      ZHOU acknowledged that in the morning on November 30, 2024, he
20  took photographs of the SpaceX Space Launch Complex with his drone.
21  *Id.* ¶ 20(c). ZHOU stated that he knew the SpaceX facility was on a
22  military installation. *Id.* ZHOU said that his drone flew for 10 or 15
23  minutes and went approximately one to two miles south towards the
24  SpaceX facility. *Id.*

25      ZHOU also admitted he purchased software on a particular website
26  that allowed the DJI Drone to bypass restrictions on altitude as well
27  as no-fly-zone restrictions that would otherwise not allow his DJI
28  drone to fly at VSFB. *Id.* ¶ 20(d). ZHOU understood that drones

operating in the United States had to comply with altitude and no-fly limits. *Id.* ZHOU originally downloaded the bypass software in 2019 to get around the no-fly zones in Shanghai. *Id.* Referencing the bypass software and his UAS, ZHOU said, "Normally, if you didn't have that software, it wouldn't be able to take off from here." *Id.*

ZHOU also said that he had not registered his drone with the FAA. *Id.* ¶ 20(e). ZHOU said FAA instructions for registering drones were not clear. *Id.* ZHOU was familiar with licensing requirements for operating a UAS in China, but he never himself got a license for his UAS. *Id.* ZHOU was not familiar with specific United States requirements for UAS licensing, but he assumed that there must be some requirements. *Id.*

On or about December 4, 2024, the Hon. Alicia G. Rosenberg, United States Magistrate Judge, authorized a warrant to search the DJI Drone, a drone controller seized from ZHOU's car, the ZHOU Cellphone, ZHOU's handheld camera, and two cellphones belonging to Individual-1, as well as storage medium inside the devices.

A review of an SD card inside the DJI Drone showed several photographs of VSFB taken from an aerial viewpoint. *Id.* ¶ 25. Metadata for those photographs show they were taken on November 30, 2024, and from a location above VSFB. *Id.*

A preliminary review of ZHOU's cellphone showed that on or about November 10, 2024, ZHOU searched on Google for the phrase "Vandenberg Space Force Base Drone Rules." *Id.* ¶ 26(a). When an agent later conducted the same search on Google, the agent saw various search results cautioning that drones were not permitted at VSFB. *Id.* Separately, in a conversation on October 22, 2024, ZHOU bragged about

hacking his drone so that it could go higher, saying "I hacked my drone. It's not supposed to go that high lol". *Id.* ¶ 26(b).

As noted in the Complaint, ZHOU, age 39, is a Chinese citizen and a lawful permanent resident of the United States. *Id.* ¶ 23; *see also* Exh. C. ZHOU arrived in the country on February 12, 2024. Complaint ¶ 21(g). Individual-1 arrived in the United States on a visitor visa on or about November 26, 2024. *Id.* ¶ 23. Both ZHOU and Individual-1 were scheduled to leave from San Francisco International Airport for return travel to China on December 9, 2024. *See Id.* ¶ 21(g).

### III.  Procedural History

On December 8, 2024, the Hon. Jean P. Rosenbluth, United States Magistrate Judge, signed the Complaint and an accompanying arrest warrant. On December 9, 2024, FBI agents arrested ZHOU while he was approaching the TSA area at San Francisco International Airport.

On December 10, 2024, an initial appearance was held in the United States District Court for the Northern District of California before the Hon. Sallie Kim, United States Magistrate Judge, pursuant to Rule 5(c)(3) of the Federal Rules of Criminal Procedure. *See* Exh. A (transcript of initial appearance). At the initial appearance, the government sought detention and defense counsel argued for release subject to bail conditions.

The Pretrial Services office in the Northern District of California did not prepare a pretrial services report for the initial appearance. The government understands that this is consistent with

that Pretrial Services office's typical practice of not preparing a pretrial services report for an out-of-district arrest.[1]

Judge Kim ordered ZHOU released pending trial subject to the following conditions:

- Defendant must appear at all proceedings as ordered by the Court and must surrender for service of any sentence imposed.

- Defendant must not commit any federal, state, or local crime.

- Defendant must not harass, threaten, intimidate, injure, tamper with, or retaliate against any witness, victim, informant, juror, or officer of the Court, or obstruct any criminal investigation. See 18 U.S.C. §§ 1503, 1510, 1512, and 1513, summarized in attachment.

- Defendant must submit to any supervision by Pretrial Services and must report immediately upon release and thereafter as directed to Pretrial Services.

- Defendant must surrender any passports or other travel documents to Pretrial Services by 12/11/24 and must not apply for any other passports or travel documents.

- Defendant must stay away from Vandenberg Space Force Baes and other military bases.

- No possession of drones.

See Exh. B (release conditions form).

---

[1] As set forth below, the government is seeking to have a pretrial services report prepared in this District prior to the bail hearing in this matter.

7

1    Judge Kim stayed her release order for a period of 24 hours,

2    *i.e.,* until approximately 11:00 a.m. on December 10, 2024, so that

3    the government could pursue a motion for review. Later on December

4    10, 2024, the government filed the instant Application for Review or

5    Reconsideration of Order Setting Conditions of Release or Detention

6    (18 U.S.C. § 3142) and Request for Hearing (CR-88).

7    **IV.  ARGUMENT**

8    **A.   Legal Standard**

9    The Bail Reform Act of 1984 directs courts to impose those

10   conditions of pretrial release that "will reasonably assure the

11   appearance of the person as required and the safety of any other

12   person and the community." 18 U.S.C. § 3142(c)(1)(B). The Act permits

13   pretrial detention of a defendant without bail where "no condition or

14   combination of conditions will reasonably assure the appearance of

15   the person as required and the safety of any other person and the

16   community." 18 U.S.C. § 3142(e).

17   Courts must consider several factors when determining whether

18   and what conditions are appropriate, namely: (1) the nature and

19   seriousness of the offense charged; (2) the weight of the evidence

20   against defendant; (3) the defendant's character, physical and mental

21   condition, family and community ties, past conduct, history relating

22   to drug or alcohol abuse, and criminal history; and (4) the nature

23   and seriousness of the danger to any person or to the community that

24   would be posed by the defendant's release. 18 U.S.C. § 3142(g);

25   *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986).

26   Consideration of non-statutory factors is disfavored. *United States*

27   *v. Diaz-Hernandez*, 943 F.3d 1196, 1199 (9th Cir. 2019).

28   Detention is appropriate where a defendant is either a danger to

8

the community or a flight risk; it is not necessary to prove both. *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985). A finding that pretrial release will not ensure the appearance of the defendant need only be supported by a preponderance of the evidence. *Motamedi*, 767 F.2d at 1406. A finding that a defendant is a danger to the community must be supported by clear and convincing evidence. 18 U.S.C. § 3142(f); *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991).

"If a person is ordered released by a magistrate judge . . . the attorney for the Government may file, with the court having original jurisdiction over the offense, a motion for revocation of the order or amendment of the conditions of release[.] The motion shall be determined promptly." 18 U.S.C. § 3145(a); *see United States v. Evans*, 62 F.3d 1233, 1237 (9th Cir. 1995). The district court conducts its own de novo review of the magistrate judge's detention order. *United States v. Koenig*, 912 F.2d 1190, 1191 (9th Cir. 1990). The district court "should review the evidence before the magistrate and make its own independent determination whether the magistrate's findings are correct, with no deference." *Id.* at 1193.

## B.    Defendant Should Be Detained Pending Trial

ZHOU poses a serious risk of flight and a serious danger to the community. No condition or combination of conditions of release could adequately mitigate those risks, and certainly not the conditions imposed by the Magistrate Court. The Bail Reform Act calls for ZHOU to be detained pending trial.

As a threshold matter, the government notes that a Pretrial Services report was not prepared in the Northern District of California, apparently consistent with the typical practice in that

court for out-of-district arrests. The government requests that a Pretrial Services report be prepared in this case prior to the bail hearing so that the Court may benefit from added information about defendant's background, characteristics, ties to the community, and the presence or absence of bail resources.

### 1. If Released, ZHOU Poses A Substantial Risk Of Flight And No Conditions Or Combination Of Conditions Adequately Mitigate The Risk Of Flight

There is an "unacceptably high risk" that if defendant is released pending trial, he will not appear as required. *See United States v. Hir*, 517 F.3d 1081, 1093 (9th Cir. 2008). Because flight is never certain, the Bail Reform Act does not call for detention only if the defendant is certain to flee. Rather, it requires detention where the government shows, by a preponderance of the evidence, that there are no conditions or combinations of conditions that will reasonably assure the defendant's appearance at future proceedings in this felony criminal case. Here, that standard is met and the defendant should be ordered detained pending trial.

*First*, the government is aware of no meaningful ties between the defendant and the United States. Defendant received his undergraduate degree from a university in Australia. *See* Exh. A at 8. Based on defendant's interview with agents, the government understands that defendant later studied at the University of North Carolina Chapel Hill between approximately 2012 and 2014. Based on defendant's travel history, he left the United States for China in 2015 and did not return to the United States until February 12, 2024. *See* Exh. C (TECS – Personal Encounter List). Based on defendant's interview, ZHOU was in the United States between February 2024 and his flight to China on December 9, 2024, so that he could look for a job in the United

10

States. He intends to return to China but continue to search for a job in the United States.

The Ninth Circuit has provided factors that may be considered "[w]hen assessing an alien defendant's ties to the United States" for the purposes of the Bail Reform Act, namely "[1] how long the defendant has resided in this country, [2] whether defendant has been employed in the United States, [3] whether defendant owns any property in this country, and [4] whether defendant has any relatives who are United States residents or citizens." *United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990).

Defendant fails all of these factors. He does not "reside" in the United States – rather, he appears to be here temporarily while job seeking. And he was arrested while trying to leave the United States for his country of origin, showing that he is *not* tied to the United States. He is not employed in the United States, does not own any property in the United States, and the government is aware of no relatives in the United States. Even if he had some relative here, the more probative question is whether he has a relative here that would somehow mitigate his risk of flight from the instant charges. See, e.g., *Townsend*, 897 F.2d at 996 ("While Mohan has a sister-in-law in Chicago, no evidence was presented concerning the nature of the relationship."). There is no evidence that defendant has the type of close family member in the United States – like a spouse or child – that would be a meaningful deterrent to flight.

The Ninth Circuit has recognized that ties to "the community" means connection to the United States *and* the community in which the indictment was brought and where defendant would be required to appear in court. *Townsend*, 897 F.2d at 995. ZHOU appeared to be

living temporarily in Northern California and flew out of San Francisco International Airport, showing that he has even fewer ties to the community where charges are pending.

*Second*, defendant appears to have established ties abroad that would make it easy to flee and remain abroad. Defendant is a Chinese national. China has no extradition treaty with the United States.[2] Based on his travel history, he has spent almost the entire past decade in China. His significant ties abroad, certainly when compared to his ties to the United States – make him a substantial flight risk regardless of the conditions imposed.

There is a separate question of whether ZHOU poses a risk of danger to the community. As discussed below, he does pose a danger. However, the risk danger to the community "usually plays little role in an analysis of the risk of nonappearance." *United States v. Dagesian*, No. 2:21-cr-00057-MCS, 2023 WL 2061934, at *3 (C.D. Cal. Feb. 15, 2023) (citing *United States v. Castaneda*, No. 18-cr-47-BLF-1, 2018 WL 888744, at *3 (N.D. Cal. Feb. 14, 2018) ("[T]he Court must be careful not to allow danger to the community to weigh into its assessment of Castaneda's flight risk . . . .").

Even if the Court set bail conditions for ZHOU's pretrial release, those limitations – such as electronic monitoring – would suffer from a "critical flaw" in that "they depend on [defendant]'s good faith compliance" in order to be effective. *United States v. Hir*, 517 F.3d 1081, 1092 (9th Cir. 2008). In particular, "electronic monitoring does not prevent a defendant from committing crimes within

---

[2] *See World Population Review*, https://worldpopulationreview.com/country-rankings/countries-without-extradition (last visited Dec. 11, 2024).

the monitoring radius," and "there is no reasonable way to assure that a defendant would not make impermissible stops or detours on his way to places permitted under the restrictions." *Id.* at 1092 n.11; *see also United States v. Tortora*, 922 F.2d 880, 886 (1st Cir. 1990) (reversing release order finding that restrictions on communications with any person not approved by counsel, monitoring of phone through pen register, 24-hour house arrest, and other conditions had "an Achilles' heel" because "virtually all of them hinge on the defendant's good faith compliance").

Importantly, as described in the Complaint, ZHOU lied to Air Force personnel who asked whether he had seen any drone pilots, and he planned out his crime at least a month ago. Any conditions of release would rely on his good faith compliance, and ZHOU's actions show that compliance is not reasonably assured.

\* \* \*

ZHOU's lack of any ties to the community make him a serious flight risk. Flight could be domestic to somewhere other than where he is facing court in Los Angeles. Flight could also be abroad to his home in China, where it would be difficult or impossible to secure his return. While defendants in other cases have established ties to the United States through close family members, like a spouse and child, or through long-term employment in the United States, ZHOU has no such ties.

At age 39, the only thing ZHOU is facing in the United State is a conviction – given the strength of the evidence – and potentially a term of imprisonment. While the charges in the Complaint are one felony count and one misdemeanor count, which together carry a maximum of four years' imprisonment, the government is continuing to

investigate whether ZHOU engaged in additional, more serious offenses. Given ZHOU's immigration status, a conviction may also result in his removal from the United States at the end of the criminal process or bar him from becoming a citizen.

The government has met its burden of showing by a preponderance of the evidence that, if released, there are no conditions or combination of conditions that will reasonably assure ZHOU's appearance at future proceedings in this case. The Bail Reform Act calls for detention.

      2.   <u>If Released, ZHOU Poses A Risk Of Danger To The Community And No Conditions Or Combination Of Conditions Adequately Mitigate The Risk Of Danger</u>

If released, defendant poses a risk of danger to other persons and the community. The risk of danger also calls for detention in this case.

Defendant's crime was brazen. As alleged in the detailed complaint, defendant violated the national defense airspace and photographed a military base from the sky. He did it after traveling to the United States for the first time in almost 10 years. At least one month ago, he began planning for his crime, searching on Google for the Vandenberg Space Force Base drone rules. His searched showed him that drones were prohibited, but he was not deterred. He also admitted to agents that years ago he downloaded special software that let him bypass restrictions on altitude and no-fly-zone restrictions.

This pre-planning shows a calculated scheme to bypass the rules – using his "hacked" drone – to capture potential defense information. One week ago, he flew his hacked drone over VSFB on the same day there was a payload launch for the National Reconnaissance Office and just a week before he was scheduled to return home to

China. If ZHOU had backed up his aerial photographs of VSFB to an online account or some other digital device and is released pending trial, it will be very difficult or impossible to meaningfully restrict his dissemination of those sensitive photographs showing a military base.

The brazenness, sophistication, and advance planning of ZHOU's scheme suggest the Court should not be comforted that ZHOU will be reasonably deterred by any bail conditions. ZHOU did not make a youthful mistake or mere accident. This was a planned scheme that risked exposing – and may have exposed – meaningful national security information through aerial photography of an air force base. Any conditions of pretrial release are premised ZHOU's good faith compliance, and his actions in committing the instant crime do not support relying on his good faith compliance to deter flight or danger to the community.

**V.    CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court order defendant Yinpiao ZHOU detained pending trial.