CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
JULIA DEIXLER (Bar No. 301954)
(E-Mail: Julia_Deixler@fd.org)
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

Attorneys for Defendant
YINPIAO ZHOU

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>YINPIAO ZHOU,<br><br>　　　　Defendant. | Case No. 25-cr-10-JFW<br><br>**YINPIAO ZHOU'S SENTENCING MEMORANDUM** |

　　Yinpiao Zhou, by and through his counsel of record, Deputy Federal Public Defender Julia Deixler, hereby submits his position regarding sentencing.

　　　　　　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　CUAUHTEMOC ORTEGA
　　　　　　　　　　　　　　　　　Federal Public Defender

DATED: March 24, 2025　　　By　*/s/ Julia Deixler*
　　　　　　　　　　　　　　　　　JULIA DEIXLER
　　　　　　　　　　　　　　　　　Deputy Federal Public Defender
　　　　　　　　　　　　　　　　　Attorney for YINPIAO ZHOU

## I. INTRODUCTION

Yinpiao Zhou appears for sentencing after pleading guilty to a violation of 49 U.S.C. §§ 46307, 40103, violation of national defense airspace, a Grade A misdemeanor. The total offense level is 2 and the criminal history category is I, resulting in an advisory guideline range of 0 to 6 months. The defense agrees with the sentence recommended by Probation of one year of probation, a $25 special assessment, and a $200 fine. *See* ECF No. 39 at 1.

## II. FACTUAL AND PROCEDURAL BACKGROUND

In November 2024, Mr. Zhou and a friend that was visiting from Shanghai began a road trip through the western United States. The duo travelled to Monterey, Yosemite, Death Valley, Las Vegas, Joshua Tree, Los Angeles, and other locations. On November 29, they arrived at night at Ocean Park beach in Santa Barbara County to camp for the night. Once they arrived, they saw a crowd of people gathered with cameras set up and learned that there would be a SpaceX rocket launch later than night. Mr. Zhou, who had a longtime fascination with outer space and rockets, was excited to see the launch. He captured photos and videos of the rocket launch on his cellphone and digital camera from Ocean Park beach. The next morning, he was eager to see the SpaceX launch pad. Mr. Zhou flew his drone into restricted airspace for a short period[1] and took approximately six photographs of the SpaceX Launch Complex and nearby roads and facilities. *See* Ex. B (Perdue report) at USAO_00037.

---

[1] The Complaint alleges that Mr. Zhou flew the drone in restricted airspace for approximately 59 minutes. ECF No. 1 at 8. However, this appears to be a misreading of the Drone Activity Report, which shows that Mr. Zhou's drone was detected by three different sensors during overlapping periods. *See* Ex. X (Drone Activity report). Specifically, the report notes that two different sensors detect the same drone within one second of one another, and each list the flight duration as 15 minutes. The third sensor begins detecting the drone just three minutes before the other two sensors and lists a flight time of 29 minutes. It appears to be impossible for each of these detections to be three separate flights by the same drone.

Further, the government's extraction report of the drone reflects that all of the photos in the area were taken between 9:12 and 9:24 a.m. The Airforce officer report indicates that they encountered Mr. Zhou at 9:30, just 14 minutes after the drone was initially detected.

According to an Airforce officer report, Mr. Zhou's drone was detected by authorities at approximately 9:16 a.m. *Id*. At 9:30 a.m., Airforce officers arrived at Ocean Park and approached Mr. Zhou and his friend and asked if they had seen anyone flying a drone. *Id*. In a moment of panic, Mr. Zhou lied and said that he had seen a drone, but not the operator. *Id*. However, he quickly corrected his mistake and admitted to being the drone pilot. *Id*. Mr. Zhou revealed his drone to the officers and showed them the photos he had taken. *Id*. He gave officers his true name and led them to his car to retrieve his identification. He consented to an interview with the Airforce officers and even signed a written statement. Mr. Zhou also admitted that he had previously purchased software for $30 on a publicly available website that allowed his drone to override certain flight restrictions, including height, distance, and no-fly zone restrictions. *See id.*

After speaking with the Airforce officers, Mr. Zhou consented to a search of his car. *Id*. at USAO_00038. He then remained on the scene until FBI agents appeared, and agreed to be interviewed again by the FBI agents. He consented to the agents' search of his cellphone. After completing searches of Mr. Zhou's drone, cellphone, and car, the federal agents told Mr. Zhou he was free to go.

Mr. Zhou continued on his road trip and then returned home to the same address in Brentwood, California that he had provided to law enforcement. On December 9, he went to SFO airport to travel home to China to visit his family. It is undisputed that Mr. Zhou's airline ticket was purchased prior to the events of the case. *See* ECF No. 10-1 at 11 (government counsel stating that Mr. Zhou was arrested "at SFO, hoping to return to China for a ticket he had already purchased"). Federal agents arrested Mr. Zhou at the airport. Once again, he agreed to speak with law enforcement, and was interviewed for about an hour. *See* Ex. D (Wood Report). He also consented to a search of his luggage. *Id*.

The following day, on December 10, Mr. Zhou made his initial appearance in the Northern District of California. The Court ordered Mr. Zhou released on a personal

1  recognizance bond with conditions of pretrial supervision. ECF No. 10-1 at 17-18.
2  However, the Court granted the government's request for a stay pending appeal of the
3  bond decision. *Id.* at 18.
4        On December 20, 2024, a bond appeal hearing was held before the Honorable
5  Judge Hernán D. Vera. Mr. Zhou waived his presence because the U.S. Marshals
6  informed the defense that he would likely not be transported to the Central District
7  before February. The defense proposed that Mr. Zhou be released on a $50,000
8  signature bond supported by two sureties, both of whom first met Mr. Zhou at UNC
9  Chapel Hill Business School and have been friends with him for over 12 years. Pretrial
10 Services in this District also recommended release with those sureties. *See* PSA
11 Report. The government sought detention based on both flight risk and danger to the
12 community. Judge Vera ordered Mr. Zhou detained on both grounds. In its brief in
13 support of detention, the government noted that "[w]hile the charges in the Complaint
14 are one felony count and one misdemeanor count, which together carry a maximum of
15 four years' imprisonment, the government is continuing to investigate whether Zhou
16 engaged in additional, more serious offenses." ECF No. 10-1 at 13-14.
17       The evidence did not support any more serious criminal charges. The
18 government conducted three separate interviews of Mr. Zhou, at least two interviews of
19 Mr. Zhou's travel companion, and searched (with Mr. Zhou's consent) his cellphone,
20 drone, car, and luggage. *See* Ex. B; Ex. D. Those searches revealed no evidence
21 whatsoever that Mr. Zhou was acting on behalf of a foreign government or intending to
22 steal or misuse national security information. None of the few photographs Mr. Zhou
23 took in and around the Airforce base was deemed to be classified. Photos taken from
24 the drone shortly before the offense depict Mr. Zhou and his friend acting as tourists,
25
26
27
28

taking photos of themselves and the scenery.

 

(Photos taken on November 29, 2024 at 4:10 p.m. and November 30, 2024 at 9:07 a.m.)

Text messages found on Mr. Zhou's cellphone revealed that on the day of the offense conduct, he had messaged two different friends about how he had unexpectedly bumped into a SpaceX rocket launch while on his road trip. *See* Ex. E (Draft Transcript of Zhou Messages, November 2024).

On January 2, 2025, the government filed an indictment charging the same offenses as those listed in the criminal complaint. Count 1 charged a violation of 49 U.S.C. § 46306(b)(6)(A), failure to register an aircraft, which carries a 3-year statutory maximum sentence, and Count 2 charged a violation of 49 U.S.C. §§ 46307, 40103, violation of national defense airspace, which carries a 1-year maximum sentence.

Mr. Zhou made his initial appearance in this District on January 30, 2025. Dkt. No. 23. The parties filed a plea agreement approximately four weeks later on March 3. Dkt. No. 33. On March 10, 2025, Mr. Zhou entered a guilty plea to Count 2.

### III. THE SENTENCING GUIDELINES

The parties agree that Mr. Zhou's offense falls under § 2X5.2 of the Sentencing Guidelines, which has a base offense level of 6. Mr. Zhou qualifies for a two-level reduction pursuant to § 3E1.1 for his acceptance of responsibility. He also qualifies for an additional two-level reduction under § 4C1.1 because he is a zero point offender. Dkt. No. 39 at 1, n.1. In total, Mr. Zhou's offense level is 2 – the second lowest

possible under the Sentencing Guidelines. *Id*. With a criminal history category of I, the applicable sentencing guidelines range is 0-6 months. *See id*.; PSR ¶ 8.

## IV. ARGUMENT

18 U.S.C. § 3553(a) requires the Court to "impose a sentence sufficient, but not greater than necessary, to comply with" the purposes of sentencing set forth in the statute. By the time of sentencing, Mr. Zhou will have served nearly four months in custody. But the fact that Mr. Zhou was detained under the Bail Reform Act does not mean that a custodial sentence is appropriate under the separate and distinct considerations required by section 3553(a). Those factors instead counsel in favor of a probationary sentence.

**A.    Probation is appropriate given Mr. Zhou's personal history and characteristics.**

Yinpiao Zhou was born in Shanghai in 1985 to his mother, Qi-Bing Zhou, and father, Sunying Zhou. Both of Mr. Zhou's grandfathers were pro-democracy counterrevolutionaries that were punished by the Chinese Communist Party. Mr. Zhou's maternal grandfather was banished to work in the countryside when his mother was two years old. His paternal grandfather sentenced to 10 years' imprisonment in the 1960s for political activity.

Mr. Zhou's father also went on to become involved in the pro-democracy movement in China and was subjected to punishment by the CCP. He participated in the Democracy Wall Movement in People's Square in Shanghai in 1978. In 1995, when Mr. Zhou was 10 years old, police showed up to the family home and arrested his father for participating in the Shanghai Democracy Movement. During the period that Mr. Zhou's father was detained, his grandmother was seriously ill and dying. She tried desperately to be able to visit her son in prison but was denied access, and died while Mr. Zhou's father was still detained.

One year later, in 1996, Mr. Zhou's mother became pregnant with his younger brother. China's "one-child policy" was still in effect at that time, and Mr. Zhou's

mother dealt with significant harassment and challenge from government authorities who tried to force her to have an abortion. Ultimately, Mr. Zhou's brother was born, and the family was able to keep him after paying an "excess birth fine" and having him not be counted in the national census.

      Despite the harsh conditions they faced in China, Mr. Zhou's parents provided him with a loving and supportive home. His parents supported and encouraged Mr. Zhou to follow his passions and create a better life for himself outside of China. Mr. Zhou's mother reports that from a young age, Mr. Zhou was obsessed with nature and the universe, as well as cars, machines, and planes. He dreamed as a young boy of becoming a pilot. He also loved exploring nature, observing wildlife, comets, and stars. He was a good student and endlessly curious, but often had trouble paying attention in school or following teachers' instructions.

      After graduating high school, Mr. Zhou enrolled in college in Australia. He then attended Business School at the University of North Carolina, Chapel Hill from 2012-2014, graduating with an MBA degree. After graduation, Mr. Zhou lived in Newark, California for approximately one year. But his student visa expired, and he was unable to find a job to allow him to remain in the United States. Mr. Zhou then returned to live with his parents in Shanghai, where he worked as a business analyst and program manager in the private sector. While in Shanghai, he applied for residence in the United States through the EB-5 Visa program. That process took almost nine years before he was approved and granted lawful permanent residence. Mr. Zhou returned to the United States in February 2024 and had been living in Northern California for 10 months looking for work before this offense.

      A life in the United States has been the dream of Mr. Zhou and his family since he was a young child. His parents bravely fought against authoritarian policies in China, and inspired Mr. Zhou to come to a democratic country with greater liberties and opportunities. Mr. Zhou writes in his letter to the Court of how he has let his parents and himself down in potentially jeopardizing this dream of a better life through

a reckless and immature mistake. *See* Ex. A (Zhou Letter). But as Mr. Zhou makes clear, he has learned from his wrongs and the serious sanction that has already befallen him. This Court need not sanction him further by leaving him with a record of a custodial sentence that could further prejudice him in future immigration proceedings. A federal conviction and sentence of probation are sufficient here.

**B.   Probation is appropriate in light of the nature and circumstances of the offense.**

Probation is also appropriate in light of the nature and circumstances of the offense. Mr. Zhou did not actually interfere with the Airforce base, nor did he obtain classified information. Although he initially lied to an Airforce officer in a moment of fear, he then immediately admitted his wrong and was extremely cooperative with law enforcement through every step of the investigation. He consented to three interviews, as well as the search of his cellphone, drone, luggage, and car. He answered officers' questions and volunteered information that was truthful but unhelpful to his case.

Mr. Zhou's conduct, while clearly wrong, was not motivated by a sinister desire to undermine the U.S. government or military. His text messages and prior conversations about drones make clear that he purchased bypass software not with the intention of specifically flying in restricted zones or military bases. Instead, Mr. Zhou is an avid drone hobbyist who generally wanted to be able to fly his drone as high and as far as possible. In pursuing that feat, he violated the law. He makes no excuse for that fact and accepts full responsibility for his conduct. But his conduct is not particularly aggravating, and not deserving of a mid-Guideline sentence, as the government advocates for.

**C.   A probationary sentence is sufficient to impose just punishment and promote deterrence, and protect the public.**

A probationary sentence is also sufficient to punish Mr. Zhou, deter him from future offenses, and protect the public. Whether the Court imposes a sentence of imprisonment or not, by the time of sentencing, Mr. Zhou will have already been

7

incarcerated for nearly four months, which is itself a serious punishment for a man who had previously never spent a single night in jail. And federal probation is no mere slap on the wrist; such a sentence still "subject[s] [defendants] to several standard conditions that substantially restrict their liberty." *Gall v. U.S.*, 552 U.S. 38, 48 (2007). Further, because Mr. Zhou is not a U.S. citizen, he may face even greater punishment through potentially serious immigration consequences, including revocation of his LPR status or even removal from the United States. "In determining what sentence is 'sufficient, but not greater than necessary,' to serve the needs of justice," this Court "may take into account the uncertainties presented by the prospect of removal proceedings and the impact of deportation will have on the defendant and his family." *United States v. Thavaraja*, 740 F.3d 253, 262-63 (2d Cir. 2014).

The goals of specific deterrence and public protection are met for these same reasons. Mr. Zhou has already been subjected to significant punishment, and faces even greater possible consequences for his actions such that he will never repeat them. A year-long term of probation will also allow Probation and this Court to monitor Mr. Zhou to ensure that he is deterred from reoffending.

**D.  A probationary sentence is appropriate under the Federal Sentencing Guidelines.**

The United States Sentencing Commission has expressed a strong policy preference for non-custodial sentences for defendants like Mr. Zhou, whose offense falls within a sentencing range of 0-6 months imprisonment. The Guidelines indicate that for a Zero Point Offender whose guideline range is in Zone A or B of the sentencing table, "a sentence other than a sentence of imprisonment … is generally appropriate." U.S.S.G. § 5C1.1, n.10. This recommendation is consistent with the statutory language in 28 U.S.C. § 994(j) regarding the "general appropriateness of imposing a sentence other than imprisonment" for "a first offender who has not been convicted of a crime of violence or an otherwise serious offense."

**E.     A probationary sentence is necessary to avoid unwanted sentencing disparities.**

In determining an appropriate sentence, the Court must also consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). A probationary sentence is favorable here because it would be consistent with the sentences imposed for similarly situated defendants. Although it appears that criminal prosecutions under 49 U.S.C. § 46307 are rare, the defense has identified at least a two cases involving similar conduct.

In *United States v. Mapes*, for example, the defendant intentionally flew a drone into a "no fly zone" not once but twice; first over Levi's Stadium in Santa Clara during a 49ers football game, and next over the Okland Coliseum during a Raiders football game. 19-cr-00286-SVK (N.D. Cal. 2019), ECF No. 1 at 4. He released over the stadium dozens of flyers of political propaganda asserting that American newsrooms and political offices had been taken over by "whores," "prostitutes and felons." *Id*. The flyers promoted a group called "The Red 'X' Society," which Mr. Mapes posted about on social media with references to violent and destructive conduct. *See id*. at 6. The government issued a summons for Mr. Mapes and did not seek his pretrial detention. *Id*. at 9; *see also id.* at ECF No. 2. The parties litigated a motion to dismiss and were preparing for trial. The day before trial was scheduled to begin, Mr. Mapes pleaded guilty to two counts of 49 U.S.C. §§ 46307 and 40103. *Id*. at ECF No. 82. He was sentenced to two years' probation. *Id*. at ECF No. 94.

In this district, in *United States v. Akemann*, the defendant intentionally flew into national defense airspace during the devastating Palisades Fire. 25-CR-74-MWF (C.D. Cal. 2025), ECF No. 6. The defendant's drone was not just present in a no-fly zone, it actually collied with and caused damage to a firefighting aircraft that was actively fighting the fire, requiring it to be out of service for some time and apparently causing over $65,000 in damage. *Id*. at ¶¶ 6, 10. Although Mr. Akemann will not be sentenced

9

until June, the government offered him a pre-indictment plea offer to a misdemeanor offense which contemplates him completing community service as a condition of either supervised release or probation. *Id*. at ¶ 2(h).

Although Mr. Zhou's offense occurred at an Airforce base, he did not interfere with any other aircrafts, disrupt any government or military activities, or capture any classified material. Mr. Zhou made a grave mistake in judgment in bypassing "no fly zone" rules in order to see SpaceX facilities that he was personally interested in. But his conduct is not more aggravated than that in the *Mapes* case, which involved actual disruption to two football games (and a defendant whom the government did not believe to be particularly remorseful, *see* ECF No. 92), or in the *Akemann* case, which caused significant damage to another aircraft and disrupted critical firefighting during the worst fire in California's history. The fact that Mr. Zhou has now served nearly four months in jail while those defendants were summonsed to court is not reflective of their relative culpability. It is instead a function of the bail factors that weighed against Mr. Zhou early on in the case, before discovery was produced — his foreign ties, limited ties in California, and the suspicion that he may have committed more serious offenses than those initially alleged. Now that the government's investigation is complete, it is clear that Mr. Zhou's conduct was not more aggravating than those in the above-referenced cases. He should also be sentenced to probation, rather than jail.

## V. CONCLUSION

For the foregoing reasons, Mr. Zhou respectfully requests that the Court impose a sentence of one year of probation.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: March 24, 2025     By  */s/ Julia Deixler*
JULIA DEIXLER
Deputy Federal Public Defender
Attorney for YINPIAO ZHOU

10